01

02

03

04

05                          UNITED STATES DISTRICT COURT
                       FOR THE EASTERN DISTRICT OF CALIFORNIA
06

07  MORGAN KANE, a.k.a. John Wetmore,        )
                                             )
08           Petitioner,                     )   CASE NO. 2:07-cv-01120-RSL-JLW
                                             )
09      v.                                   )
                                             )
10  CLAUDE FINN, Warden,                     )   REPORT AND RECOMMENDATION
                                             )
11           Respondent.                     )
    _____ )
12

13       I.      SUMMARY

14           Petitioner Morgan Kane, also known as John Wetmore,[1] is currently incarcerated at

15  the Deuel Vocational Institution in Tracy, California.  He pled guilty to one count of first

16  degree murder, two counts of forgery, and one count of attempted forgery in Fresno County

17  Superior Court on January 17, 1984, and was sentenced to twenty-seven-years-to-life with the

18  possibility of parole.  (*See* Dkt. 1, Ex. A at 1-2.)  He has filed a petition for writ of habeas

19  corpus under 28 U.S.C. § 2254 challenging the 2005 denial of parole by the Board of Parole

20

21

    _____

22          [1] When petitioner was adopted, his name was changed from Morgan James Kane to John Wetmore.
    Petitioner legally changed it back to Morgan James Kane on October 26, 1990.  (*See* Docket 1, Exhibit C3 at 1.)


REPORT AND RECOMMENDATION -1

01   Hearings of the State of California (the "Board").[2]  Respondent has filed an answer to the

02   petition together with relevant portions of the state court record, and petitioner has filed a

03   traverse in response to the answer.  The briefing is now complete and this matter is ripe for

04   review.  The Court, having thoroughly reviewed the record and briefing of the parties,

05   recommends the petition be denied and this action be dismissed with prejudice.

06        II.   BACKGROUND

07        In July 1983, petitioner was involved in a failed attempt to cash a forged check

08   at the First Interstate Bank of California on the account of Stanley John Kearns,

09   petitioner's disabled step-father.  (*See* Dkt. 1, Ex. B at 9; *id*., Ex. C3 at 8.)  Petitioner

10   was also involved in cashing two forged checks in the amounts of $230 and $170 on

11   Mr. Kearns' account.  (*See id*., Ex. B at 9; *id*., Ex. C3 at 8.)  Shortly after the forgeries,

12   petitioner was involved in the poisoning of Mr. Kearns, which resulted in his death.

13   (*See id*.)

14        Petitioner elected not to discuss the circumstances of the murder offense with

15   the panel during the 2005 hearing.  (*See id*., Ex. B at 11.)  As a result, the Board relied

16   upon a synopsis of the offense written by petitioner, and kept in his central file at the

17   prison.  (*See id*. at 9.)  Petitioner's version of the crime is therefore as follows.

18        After returning home from work on July 13, 1983, petitioner discovered the

19   body of the victim, Mr. Kearns, on the living room floor of his house.  (*See id*., Ex. B

20   at 9-10.)  Petitioner claims that he had a strained relationship with the victim, who had

21

22        [2] The Board of Parole Hearings replaced the Board of Prison Terms, which was abolished on July 1,
     2005.  *See* California Penal Code § 5075(a).

REPORT AND RECOMMENDATION -2

01 been arrested on a prior occasion for hitting petitioner's step-sister, Jackie.  (*See id*. at

02 10.)  Because of petitioner's history of verbal and physical confrontation with the

03 victim, petitioner's first thought when he discovered the body was to get it away from

04 his home.  (*See id*.)  He was attempting to put the body in a sleeping bag when his

05 wife, Sandra, arrived home from dropping their son at a friend's house.  (*See id*.)

06      Sandra told petitioner she had invited the victim over for dinner.  (*See id*.)

07 Petitioner claims the victim, who trusted Sandra, had previously shown her a purchase

08 he had made of potassium cyanide in order "to settle scores with a number of people."

09 (*Id*.)  Sandra knew the victim carried asthma medication in capsule form.  (*See id*.)

10 When the opportunity presented itself, she emptied asthma capsules and filled them

11 with potassium cyanide.  (*See id*.)  The victim took a capsule after dinner, just as

12 Sandra expected he would, although it surprised her when he quickly collapsed.  (*See

13 id*. at 11.)  She was unable to lift and conceal the body without assistance, which was

14 why she had left the body in the living room while she drove her son to a friend's

15 house.  (*See id*.)  Petitioner did not attempt to explain Sandra's motive for poisoning

16 the victim.

17      Petitioner and Sandra then worked together to conceal the crime.  After placing

18 the body in the sleeping bag, they lifted it onto the bed of their pickup truck and drove

19 the body to a remote location in South Fresno to dispose of it.  (*See id*.)  When the

20 couple realized they had forgotten to bring a shovel to bury the body, they began to

21 argue, attracting the attention of a nearby homeowner.  (*See id*.)  After driving around

22 for a while, petitioner and his wife eventually dumped the body behind some crops in

REPORT AND RECOMMENDATION -3

01 a field.  (*See id*.)  Petitioner placed a piece of paper with his name and number in the

02 victim's wallet as someone to be notified "in case of emergency," and petitioner and

03 Sandra were subsequently notified of the victim's death.  (*See id*.)  The toxicology

04 report confirmed that cyanide was present in the victim's blood at levels that could

05 cause death.  (*See* Dkt. 12, Ex. D at 6.)

06       Contrary to petitioner's account of the crime, the probation officer's report

07 provides that petitioner, Jackie, and Sandra worked together as crime partners to cash

08 the forged checks drawn on the victim's account, and poison the victim in order to

09 obtain the proceeds of his life insurance policy.  (*See id*. at 3-4.)  Jackie was the named

10 beneficiary of the victim's policy.  (*See id.* at 6; Dkt. 1, Ex. C3 at 8.)  According to

11 Jackie, the victim was poisoned by Sandra and petitioner in order to help her obtain

12 the policy proceeds, and petitioner had told Jackie he expected to receive $33,000 of

13 her inheritance.  (*See* Dkt. 12, Ex. D at 6.)

14       Petitioner pled guilty to one count of attempted forgery, two counts of forgery, and

15 one count of first degree murder in Fresno County Superior Court on January 17, 1984.  (*See*

16 Dkt. 1, Ex. A at 1-2.)  Petitioner's minimum eligible parole date was set for April 8, 2000.

17 (*See id*., Ex. B at 1.)  The parole denial which is the subject of this petition took place after a

18 parole hearing held on November 9, 2005.  (*See id*.)  This was petitioner's third parole

19 consideration hearing.  (*See id.*, Exs. C1-C3.)  Petitioner committed the offenses when he was

20 twenty-three years of age.  (*See id*., Ex. C1 at 1.)  As of the date of the 2005 parole hearing,

21 petitioner was fifty-one-years-old, and had been in custody for approximately twenty-one

22 years.  (*See id.*, Ex. B at 1; *id*., Ex. C3 at 1.)

REPORT AND RECOMMENDATION -4

01     After denial of his 2005 application, petitioner filed habeas corpus petitions in the

02 Fresno County Superior Court, California Court of Appeal, and California Supreme Court.

03 (*See id*., Exs. G, I, and L.)  Those petitions were unsuccessful.  (*See id*., Exs. G, I, and L.)

04 This federal habeas petition followed.  Petitioner contends the 2005 denial by the Board

05 violated his Fifth and Fourteenth Amendment Due Process rights.  Thus, petitioner does not

06 challenge the validity of his conviction, but instead challenges the Board's 2005 decision

07 finding him unsuitable for parole.

08     III.    STANDARD OF REVIEW

09     The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this

10 petition because it was filed after the enactment of AEDPA.  *See Lindh v. Murphy*, 521 U.S.

11 320, 326-27 (1997).  Because petitioner is in custody of the California Department of

12 Corrections pursuant to a state court judgment, 28 U.S.C. § 2254 provides the exclusive

13 vehicle for his habeas petition.  *See White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir.), *cert.*

14 *denied*, 543 U.S. 991 (2004) (providing that § 2254 is "the exclusive vehicle for a habeas

15 petition by a state prisoner in custody pursuant to a state court judgment, even when the

16 petitioner is not challenging his underlying state court conviction."). Under AEDPA, a habeas

17 petition may not be granted with respect to any claim adjudicated on the merits in state court

18 unless petitioner demonstrates that the highest state court decision rejecting his petition was

19 either "contrary to, or involved an unreasonable application of, clearly established Federal

20 law, as determined by the Supreme Court of the United States," or "was based on an

21 unreasonable determination of the facts in light of the evidence presented in the State court

22 proceeding."  28 U.S.C. § 2254(d)(1) and (2).

REPORT AND RECOMMENDATION -5

01        As a threshold matter, this Court must ascertain whether relevant federal law was

02  "clearly established" at the time of the state court's decision.  To make this determination, the

03  Court may only consider the holdings, as opposed to dicta, of the United States Supreme

04  Court.  *See Williams v. Taylor*, 529 U.S. 362, 412 (2000).  In this context, Ninth Circuit

05  precedent remains persuasive but not binding authority.  *See id.* at 412-13; *Clark v. Murphy*,

06  331 F.3d 1062, 1069 (9th Cir. 2003).

07        The Court must then determine whether the state court's decision was "contrary to, or

08  involved an unreasonable application of, clearly established Federal law."  *See Lockyer v.*

09  *Andrade*, 538 U.S. 63, 71 (2003).  "Under the 'contrary to' clause, a federal habeas court may

10  grant the writ if the state court arrives at a conclusion opposite to that reached by [the

11  Supreme] Court on a question of law or if the state court decides a case differently than [the]

12  Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.

13  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

14  state court identifies the correct governing legal principle from [the] Court's decisions but

15  unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  At all

16  times, a federal habeas court must keep in mind that it "may not issue the writ simply because

17  [it] concludes in its independent judgment that the relevant state-court decision applied clearly

18  established federal law erroneously or incorrectly.  Rather that application must also be

19  [objectively] unreasonable."  *Id.* at 411.

20        In each case, the petitioner has the burden of establishing that the state court decision

21  was contrary to, or involved an unreasonable application of, clearly established federal law.

22  *See* 28 U.S.C. § 2254; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).  To determine

REPORT AND RECOMMENDATION -6

01  whether the petitioner has met this burden, a federal habeas court looks to the last reasoned

02  state court decision because subsequent unexplained orders upholding that judgment are

03  presumed to rest upon the same ground. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04

04  (1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007).

05        Finally, AEDPA requires federal courts to give considerable deference to state court

06  decisions, and state courts' factual findings are presumed correct. *See* 28 U.S.C. § 2254(e)(1).

07  Federal courts are also bound by a state's interpretation of its own laws. *See Murtishaw v.*

08  *Woodford*, 255 F.3d 926, 964 (9th Cir. 2001) (citing *Powell v. Ducharme,* 998 F.2d 710, 713

09  (9th Cir. 1993)).

10        IV.     FEDERAL HABEAS CHALLENGES TO STATE PAROLE DENIALS

11        A.     *Due Process Right to be Released on Parole*

12        Under the Fifth and Fourteenth Amendments to the United States Constitution, the

13  government is prohibited from depriving an inmate of life, liberty or property without the due

14  process of law.  U.S. Const. amends. V, XIV.  A prisoner's due process claim must be

15  analyzed in two steps: the first asks whether the state has interfered with a constitutionally

16  protected liberty or property interest of the prisoner, and the second asks whether the

17  procedures accompanying that interference were constitutionally sufficient. *Ky. Dep't of*

18  *Corrs. v. Thompson*, 490 U.S. 454, 460 (1989); *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d

19  1123, 1127 (9th Cir. 2006).

20        Accordingly, our first inquiry is whether petitioner has a constitutionally protected

21  liberty interest in parole.  The Supreme Court articulated the governing rule in this area in

22  *Greenholtz v. Inmates of Neb. Penal,* 442 U.S. 1 (1979), and *Board of Pardons v. Allen,* 482

01  U.S. 369 (1987).  *See McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (applying

02  "the 'clearly established' framework of *Greenholtz* and *Allen*" to California's parole scheme).

03  The Court in *Greenholtz* determined that although there is no constitutional right to be

04  conditionally released on parole, if a state's statutory scheme employs mandatory language

05  that creates a presumption that parole release will be granted if certain designated findings are

06  made, the statute gives rise to a constitutional liberty interest.  *See Greenholtz*, 442 U.S. at 7,

07  12; *Allen*, 482 U.S. at 377-78.

08       As discussed *infra*, California statutes and regulations afford a prisoner serving an

09  indeterminate life sentence an expectation of parole unless, in the judgment of the parole

10  authority, he "will pose an unreasonable risk of danger to society if released from prison."

11  Title 15 Cal. Code Regs., § 2402(a).  The Ninth Circuit has therefore held that "California's

12  parole scheme gives rise to a cognizable liberty interest in release on parole."  *McQuillion*,

13  306 F.3d at 902.  To similar effect,  *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007) held

14  that California Penal Code § 3041 vests all "prisoners whose sentences provide for the

15  possibility of parole with a constitutionally protected liberty interest in the receipt of a parole

16  release date, a liberty interest that is protected by the procedural safeguards of the Due

17  Process Clause."  This "liberty interest is created, not upon the grant of a parole date, but

18  upon the incarceration of the inmate."  *Biggs v. Terhune*, 334 F.3d 910, 915 (2003).  *See also*

19  *Sass*, 461 F.3d at 1127.

20       Because the Board's denial of parole interfered with petitioner's constitutionally-

21  protected liberty interest, this Court must proceed to the second step in the procedural due

22  process analysis and determine whether the procedures accompanying that interference were

01    constitutionally sufficient.  "[T]he Supreme Court [has] clearly established that a parole

02    board's decision deprives a prisoner of due process with respect to this interest if the board's

03    decision is not supported by 'some evidence in the record.'"  *Irons*, 505 F.3d at 851 (citing

04    *Superintendent v. Hill*, 472 U.S. 445, 457 (1985) (holding the "some evidence" standard

05    applies in prison disciplinary proceedings)).  The "some evidence" standard requires this

06    Court to determine "whether there is any evidence in the record that could support the

07    conclusion reached by the disciplinary board."  *Hill*, 472 U.S. at 455-56.  Although *Hill*

08    involved the accumulation of good time credits rather than release on parole, later cases have

09    held that the same constitutional principles apply in the parole context because both situations

10    directly affect the duration of the prison term.  *See e.g., Jancsek v. Or. Bd. of Parole*, 833 F.2d

11    1389, 1390 (9th Cir. 1987) (adopting the "some evidence" standard set forth by the Supreme

12    Court in *Hill* in the parole context); *Sass*, 461 F.3d at 1128-29 (holding the same); *Biggs*, 334

13    F.3d at 915 (holding the same); *McQuillion*, 306 F.3d at 904 (holding the same).

14          "The fundamental fairness guaranteed by the Due Process Clause does not require

15    courts to set aside decisions of prison administrators that have some basis in fact," however.

16    *Hill*, 472 U.S. at 456.  Similarly, the "some evidence" standard is not an invitation to examine

17    the entire record, independently assess witnesses' credibility, or re-weigh the evidence.  *Id.* at

18    455.  Instead, it is there to ensure that an inmate's loss of parole was not arbitrarily imposed.

19    *See id.* at 454.  The Court in *Hill* added an exclamation point to the limited scope of federal

20    habeas review when it upheld the finding of the prison administrators despite the Court's

21    characterization of the supporting evidence as "meager."  *See id.* at 457.

22

REPORT AND RECOMMENDATION -9

01          B.      *California's Statutory and Regulatory Scheme*

02          In order to determine whether "some evidence" supported the Board's decision with

03   respect to petitioner, this Court must consider the California statutes and regulations that

04   govern the Board's decision-making.  *See Biggs*, 334 F.3d at 915.  Under California law, the

05   Board is authorized to set release dates and grant parole for inmates with indeterminate

06   sentences.  *See* Cal. Penal Code § 3040 and 5075, *et seq.*  Section 3041(a) requires the Board

07   to meet with each inmate one year before the expiration of his minimum sentence and

08   normally set a release date in a manner that will provide uniform terms for offenses of similar

09   gravity and magnitude with respect to their threat to the public, as well as comply with

10   applicable sentencing rules.  Subsection (b) of this section requires that the Board set a release

11   date "unless it determines that the gravity of current convicted offense or offenses, or the

12   timing and gravity of current or past convicted offense or offenses, is such that consideration

13   of the public safety requires a more lengthy period of incarceration."  *Id.*, § 3041(b).  Pursuant

14   to the mandate of § 3041(a), the Board must "establish criteria for the setting of parole release

15   dates" which take into account the number of victims of the offense as well as other factors in

16   mitigation or aggravation of the crime.  The Board has therefore promulgated regulations

17   setting forth the guidelines it must follow when determining parole suitability.  *See* 15 CCR

18   § 2402, *et seq.*

19          Accordingly, the Board is guided by the following regulations in making a

20   determination whether a prisoner is suitable for parole:

21          (a) General. The panel shall first determine whether the life prisoner is suitable for
            release on parole. Regardless of the length of time served, a life prisoner shall be
22          found unsuitable for and denied parole if in the judgment of the panel the prisoner will

REPORT AND RECOMMENDATION -10

01    pose an unreasonable risk of danger to society if released from prison.

02    (b) Information Considered. All relevant, reliable information available to the panel
      shall be considered in determining suitability for parole. Such information shall
03    include the circumstances of the prisoner's social history; past and present mental
      state; past criminal history, including involvement in other criminal misconduct which
04    is reliably documented; the base and other commitment offenses, including behavior
      before, during and after the crime; past and present attitude toward the crime; any
05    conditions of treatment or control, including the use of special conditions under which
      the prisoner may safely be released to the community; and any other information
06    which bears on the prisoner's suitability for release. Circumstances which taken alone
      may not firmly establish unsuitability for parole may contribute to a pattern which
07    results in a finding of unsuitability.

08    15 CCR § 2402(a) and (b).  Subsections (c) and (d) also set forth suitability and unsuitability

09    factors to further assist the Board in analyzing whether an inmate should be granted parole,

10    although "the importance attached to any circumstance or combination of circumstances in a

11    particular case is left to the judgment of the panel." 15 CCR § 2402(c).

12         In examining its own statutory and regulatory framework, the California Supreme

13    Court in *In re Lawrence* recently held that the proper inquiry for a reviewing court is

14    "whether some evidence supports the *decision* of the Board … that the inmate constitutes a

15    current threat to public safety, and not merely whether some evidence confirms the existence

16    of certain factual findings."  *Id.*, 44 Cal.4th 1181, 1212 (2008).  The court also asserted that

17    the Board's decision must demonstrate "an individualized consideration of the specified

18    criteria, but "[i]t is not the existence or nonexistence of suitability or unsuitability factors that

19    forms the crux of the parole decision; the significant circumstance is how those factors

20    interrelate to support a conclusion of current dangerousness to the public."  *Id.* at 1204-05,

21    1212.  As long as the evidence underlying the Board's decision has "some indicia of

22    reliability," parole has not been arbitrarily denied.  *See Jancsek*, 833 F.2d at 1390.  As the

01 California courts have continually noted, the Board's discretion in parole release matters is

02 very broad. *See Lawrence*, 44 Cal.4th at 1204. Thus, the penal code, corresponding

03 regulations, and California law clearly establish that the fundamental consideration in parole

04 decisions is public safety and an assessment of a prisoner's current dangerousness. *See id.*, at

05 1205-06.

06        C.    *Summary of Governing Principles*

07      By virtue of California law, petitioner has a constitutional liberty interest in release on

08 parole. The parole authorities may decline to set a parole date only upon a finding that

09 petitioner's release would present an unreasonable present risk of danger to society if he is

10 released from prison. Where the parole authorities deny release, based upon an adverse

11 finding on that issue, the role of a federal habeas court is narrowly limited. It must deny relief

12 if there is "some evidence" in the record to support the parole authority's finding of present

13 dangerousness. The penal code, corresponding regulations, and California law clearly support

14 this definition of the issues.

15       V.     PARTIES' CONTENTIONS

16      Petitioner contends that the Board violated his state and federal due process rights by

17 finding him unsuitable for parole without some evidence that he poses an unreasonable risk of

18 danger to society if released from prison.[3] (*See* Dkt. 1 at 24-45.) Specifically, he argues that

19 the Board erred by considering the immutable facts of the commitment offense, and failed to

20 consider evidence in the record indicating that petitioner was suitable for release on parole.

---

21       [3] We do not reach petitioner's claim that his state due process rights were violated, as state claims are not cognizable in a federal habeas petition. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (asserting that "it

22 is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

REPORT AND RECOMMENDATION -12

01  (*See id*. at 32 and 43-45.)  Petitioner also argues that he has been imprisoned for a period of

02  time that is "constitutionally disproportionate to the commitment offense or offenses," in

03  violation of his Eighth Amendment right to be free from cruel and unusual punishment.  (*See*

04  *id*. at 21.)  Finally, he contends that the Board's reliance upon the circumstances of his

05  commitment offense "transforms an offense for which California provides eligibility for

06  parole into a de fact life imprisonment without the possibility of parole," in violation of the Ex

07  Post Facto Clause of the United States Constitution.  (*See id*. at 46-47.)

08          Respondent claims that petitioner does not have a constitutionally protected liberty

09  interest in being released on parole, that the "some evidence" standard is inapplicable in this

10  context, and that even if he does have a protected liberty interest, the Board adequately

11  predicated its denial of parole on "some evidence."  (*See* Dkt. 12 at 5-11.)  Accordingly,

12  respondent argues that petitioner's due process rights were not violated by the Board's 2005

13  decision, and the Fresno County Superior Court's Order upholding the Board's 2005 parole

14  denial was not an unreasonable application of clearly established federal law.  (*See id*. at 11-

15  12.)

16          VI.     ANALYSIS OF RECORD IN THIS CASE

17          A.      *State Court Proceedings*

18          Petitioner's habeas petitions filed in the California Court of Appeal and California

19  Supreme Court contained the same claims as his Fresno County Superior Court petition, and

20  both petitions were summarily denied.  (*See* Dkt. 1, Exs. G, H, and L.)  The parties agree that

21  petitioner has properly exhausted his state court remedies, and timely filed the instant petition.

22  (*See* Dkt. 1 at 14; Dkt. 12 at 3.)  This Court reviews the Fresno County Superior Court's

01  Order upholding the Board's decision to determine whether it meets the deferential AEDPA

02  standards, as it is the last reasoned state court decision.  *See Ylst*, 501 U.S. at 803-04.

03      In a reasoned decision denying petitioner's request for habeas relief, the Fresno

04  County Superior Court asserted that based upon its review of the record, "there is 'some

05  evidence' to support the parole decision in this case." (*See* Dkt. 1, Ex. G at 1.)  The superior

06  court found that the evidence "includes, but is not limited to, petitioner's social history, his

07  criminal background, and the nature of the crime that resulted in his first-degree murder

08  conviction." (*Id.*)  It therefore concluded that further consideration of petitioner's habeas

09  petition was not warranted.  (*See id*. at 2.)

10          B.      *Petitioner's Due Process Claim*

11      The Board based its decision that petitioner was unsuitable for parole primarily upon

12  his commitment offense, but also cited his unstable social history, criminal record, failure to

13  profit from society's previous attempts to correct his criminality, disciplinary history in

14  prison, insufficient participation in self-help programming, and law enforcement's continued

15  opposition to petitioner's release on parole.  (*See id*., Ex. B at 65-72.)  The Board's findings

16  tracked the applicable unsuitability and suitability factors listed in § 2402(b), (c) and (d) of

17  title 15 of the California Code of Regulations.  After considering all reliable evidence in the

18  record, the Board concluded that evidence of petitioner's positive behavior in prison did not

19  outweigh evidence of his unsuitability for parole.  (*See id*. at 65.)

20      The Board primarily relied upon the circumstances of petitioner's commitment offense

21  to find petitioner unsuitable for parole.  (*See id*. at 65-66.)  The Board asserted that the murder

22  was cruel and callous, because "the victim was invited to dinner and poisoned." (*Id.* at 65.)

REPORT AND RECOMMENDATION -14

01  Specifically, what should have been "a very social event where people are sitting down,

02  exchanging food, and having a conversation" instead involved the victim being invited over to

03  petitioner's house not knowing that "he was essentially loathed" there, and then poisoned to

04  death.  (*Id*. at 65.)  The Board found that the offense was "carried out in a dispassionate and or

05  calculated manner such as an execution style murder [because the] poison [had] been

06  purchased in advance, so any notion of spontaneity [or] of opportunity just doesn't seem to

07  register with us."  (*Id*. at 66.)  The murder was also "carried out in a manner which

08  demonstrates an exceptionally callous disregard for human suffering [because] … cyanide

09  poisoning is not a pretty way for anyone to die."  (*Id*.)  In addition, the Board was not satisfied

10  by petitioner's comments to the panel which "blame[d] his youth and recklessness" for the

11  offense, and it found petitioner's motive to be inexplicable or very trivial.  (*Id*.)  *See also* 15

12  CCR § 2402(c)(1)(B), (D) and (E).  Petitioner's apparent motive was to obtain proceeds from

13  the victim's life insurance policy.  (*See* Dkt. 12, Ex. D at 6.)  This in conjunction with the

14  circumstances surrounding petitioner's commitment offense clearly provides "some evidence"

15  to support the Board's conclusion that petitioner would present an unreasonable risk of danger

16  to society if released from prison.

17       The second unsuitability factor relied upon by the Board was petitioner's unstable

18  social history.  (*See* Dkt. 1, Ex. B at 66.)  During the hearing, the Board discussed petitioner's

19  history of relationships with others, and petitioner admitted, "I can't say I really had good

20  relationships [prior to my incarceration]."  (*Id*. at 12.)  Before petitioner's natural mother died

21  of alcoholism, she frequently placed him in orphanages or foster homes while she looked for

22  work.  (*See id*. at 24.)  When she placed petitioner with the Wetmores, she promised to return

01  for him, but petitioner never heard from her again.  (*See id*.)  The Wetmores adopted

02  petitioner, but their relationship was "complex" and petitioner became an emancipated minor

03  at age sixteen shortly after Mrs. Wetmore died from cancer.  (*See id*. at 25; *id*., Ex. C3 at 3.)

04  The only sibling with whom petitioner maintained a relationship was his step-sister Jackie,

05  one of petitioner's crime partners during the instant offense.  (*See id*., Ex. C3 at 4.)

06  Petitioner's two marriages also ended in divorce, including his marriage to the second crime

07  partner, Sandra.  (*See id*.; *id*., Ex. B. at 26-27.)  In its decision, the Board especially

08  emphasized petitioner's "long standing feud" with his step-father, the victim, which petitioner

09  described to the panel as "a power struggle" over Jackie.  (*See id*., Ex. B at 12, 14-17, and 66-

10  67.)  The Board's finding that petitioner "has a history of unstable or tumultuous relationships

11  with others" was therefore supported by "some evidence."  *See* 15 CCR § 2402(c)(3).

12          The third and fourth factors relied upon by the Board were petitioner's criminal record

13  and failure to profit from society's previous attempts to correct his criminality.  (*See* Dkt. 1,

14  Ex. B at 67.)  Specifically, the Board noted during the hearing that petitioner had a substantial

15  record of prior criminal behavior, both as a juvenile and adult.  (*See id*. at 18-24.)  The Board

16  observed that petitioner's initial encounter with law enforcement was for burglary, theft, and

17  forgery when he was fourteen-years-old.  (*See id*. at 18.)  A year later, petitioner stole a

18  wallet, and was found guilty of possessing a loaded firearm at a public school after he

19  concealed a loaded .38 caliber Smith & Wesson revolver in his locker.  (*See id*.; Dkt. 12, Ex.

20  D at 7.)  The same year, petitioner committed another burglary in a golf shop while carrying a

21  loaded rifle, and was removed from the Wetmores and placed in the Albany Hills School.

22  (*See* Dkt. 1, Ex. B at 20; Dkt. 12, Ex. D at 7.)  He ran away that summer, in violation of his

REPORT AND RECOMMENDATION -16

01  probation.  (*See* Dkt. 1, Ex. B at 20; Dkt. 12, Ex. D at 7.)  After he was apprehended,

02  petitioner was committed to the Fresno County Youth Center, where he escaped and was

03  caught joyriding in a stolen vehicle two days later.  (*See* Dkt. 1, Ex. B at 21; Dkt. 12, Ex. D at

04  8.)  Petitioner was next placed in the El Dorado Boys Home, where he violated probation on

05  two occasions by running away.  (*See* Dkt. 1, Ex. B at 21; Dkt. 12, Ex. D. at 8.)  After a stay

06  in the El Dorado County Juvenile Hall, petitioner was ultimately released to the Wetmores.

07  (*See* Dkt. 12, Ex. D at 8.)  In May 1974, several years later, he committed a third burglary by

08  breaking into a private residence, ransacking the entire home, and removing guns, money, and

09  other valuables.  (*See id.*)  Thus, with the exception of the time petitioner spent serving as a

10  coroner in the Navy until 1975, petitioner was in trouble with the law on a consistent basis

11  from a young age.  (*See* Dkt. 1, Ex. B at 22.)

12          According to the Board, petitioner's adult criminal history includes two arrests for

13  grand theft of property in June 1978 and April 1982, but the charges were dismissed by the

14  prosecutor on both occasions.  (*See id.* at 23.)  Petitioner was also convicted of resisting a

15  public officer in June 1985, as well as obstructing and resisting a peace officer, two counts of

16  battery, and failure to appear in October 1984.  (*See id*; Dkt. 12, Ex. D at 9.)  Petitioner's

17  substantial juvenile and adult criminal record, as well as his failure to profit from grants of

18  juvenile probation or juvenile camp, provides "some evidence" to support the Board's finding

19  that petitioner would pose an unreasonable risk of danger to society if released on parole.

20  (*See* Dkt. 1, Ex. B at 67.)

21          The fifth factor relied upon by the Board was petitioner's history of disciplinary

22  violations in prison.  In its decision, the Board noted that petitioner "had one 128A in 1984 …

REPORT AND RECOMMENDATION -17

01  [and] six 115's, the last being in 1999." (*See id*. at 38 and 69.)  A "CDC 115" documents a

02  prisoner's misconduct believed to be a violation of law or otherwise not minor in nature,

03  whereas a "CDC 128A" documents incidents of minor misconduct.  *See* 15 CCR § 3312(a)(2)

04  and (3); *In re Gray*, 151 Cal.App.4th 379, 389 (2007).  In this case, the CDC 115's were

05  received for fighting with another inmate, jamming the key mechanism of a state-issued lock

06  on a cell door, falsification of a state document, quitting a work assignment, and self-inflicted

07  injuries.  (*See* Dkt. 12, Ex. C3 at 5.)  On June 21, 1999, petitioner received his most recent

08  CDC 115 for falsely reporting a felony crime to gain special consideration, although

09  petitioner denies that his report was false.  (*See* Dkt. 1, Ex. B at 49-50.)  Accordingly, there

10  was "some evidence" to support the Board's conclusion that these infractions, combined with

11  other evidence of unsuitability, indicate that petitioner would present an unreasonable risk of

12  danger to society if released on parole.

13         The sixth factor relied upon by the Board was petitioner's limited programming while

14  incarcerated.  The Board found petitioner failed to benefit from a "balance" of self-help

15  programs.  (*See id*. at 35-37 and 69.)  Specifically, it asserted that although petitioner had

16  "done a tremendous job on the vocational working side, [he had not] done as good a job on

17  the balance behavior (sic) of the self-help side."  (*Id*.)  Petitioner was encouraged to reflect

18  upon how he can manage his time in order to "find a better balance" of programs.  (*See id*. at

19  69-70).  The Board recommended several specific programs, such as "the parole

20  (indiscernible) prevention program.  That's offered here.  You should [get] involve[d] in that.

21  There's an anger management one for your self-help."  (*Id*. at 71.)  Furthermore, contrary to

22  petitioner's contention that the Board effectively required him to take part in A.A. by

REPORT AND RECOMMENDATION -18

01  recommending additional self-help, the Board informed petitioner that he could participate in

02  self-help programs other than A.A.  (*Id.* at 71-72; Dkt. 1 at 33-34.)

03       Petitioner argues that the Board erred by failing to "consider Petitioner's job as an

04  Inmate Minister as a form of self-help," and that if the Board had considered petitioner's

05  religious activities at the prison, "it would not have found that Petitioner needs a 'better

06  balance' of self-help."  (Dkt. 1 at 32.)  Before making a suitability determination, the Board

07  must consider "[a]ll relevant, reliable information available to the panel," and there is no

08  indication that the Board failed to comply with this mandate.  15 CCR § 2402(b).  In fact,

09  during the panel's discussion of petitioner's self-help activities, the Board asserted that "in

10  reviewing the record we're going to indicate to you that you have programmed in a limited

11  manner while incarcerated.  You haven't sufficiently benefited from self-help."  (*See* Dkt. 1,

12  Ex. B at 69.)  Although petitioner has engaged in numerous religious activities in order to

13  become a certified Druid or Wiccan minister, his participation in self-help programs

14  specifically designed to rehabilitate him or prevent future criminal acts has been minimal.

15  (*See id.*, Exs. E and F.)  Especially in light of petitioner's past criminal history and

16  disciplinary violations in prison, the Board's recommendation that petitioner pursue a

17  "balance" of self-help activities that will help combat criminal tendencies, such as anger

18  management, was reasonable.  Regardless of whether the Board considered petitioner's

19  Wiccan or Druid religious activities as a form of self-help or part of petitioner's vocational

20  programming, the Board's conclusion that more self-help was necessary before petitioner

21  would be suitable for parole was supported by "some evidence" in the record.

22

01    Finally, the Board considered the Fresno County District Attorney's statement of

02 opposition to petitioner's parole.  (*See id*. at 70.)  Pursuant to California Penal Code

03 Regulation § 3041.7, a prosecutor may attend a parole hearing to represent "the interests of

04 the people."  In the absence of other reliable evidence of unsuitability in the record,

05 opposition by law enforcement based upon the nature of the commitment offense does not

06 constitute "some evidence" to support parole denial.  *See Rosenkrantz v. Marshall,* 444 F.

07 Supp. 2d 1063, 1080 n.14 (C.D. Cal. 2006) (providing that where a district attorney and

08 sheriff's department opposed parole based solely upon the gravity of the commitment offense,

09 their opposition did not constitute "some evidence" because it was "merely cumulative" of the

10 Board's findings regarding the offense).  Because the Board relied upon other reliable

11 evidence of petitioner's unsuitability for parole, however, its additional consideration of law

12 enforcement's opposition was not arbitrary and capricious.  *See id*.

13    Contrary to petitioner's argument that the Board failed to consider or give appropriate

14 weight to the parole suitability rules which favored petitioner, the Board acknowledged that

15 petitioner expressed remorse about his role in the murder.  (*See* Dkt. 1, Ex. B at 69.)  *See also*

16 15 CCR § 2402(d)(13).  The Board also praised petitioner's "fine parole plans," as well as the

17 "tremendous job" petitioner has done upgrading vocationally while incarcerated.  (*See* Dkt. 1,

18 Ex. B at 69-70.)  *See also* 15 CCR § 2402(d)(8).  In addition, the Board asserted that

19 petitioner's 2005 psychological report's assessment that petitioner presents a low risk of

20 danger in the institution and community is "a very favorable sign."  (*See* Dkt. 1, Ex. B at 70.)

21 As mentioned above, the Board has broad discretion to determine how suitability and

22 unsuitability factors interrelate to support its conclusion of current dangerousness to the

01 public.  *See Lawrence*, 44 Cal.4th at 1212.  Despite petitioner's gains, the Board determined

02 that he remains an unreasonable risk of danger to society if released on parole, and these

03 findings were supported by "some evidence" in the record.  (*See* Dkt. 1, Ex. B at 65.)

04          C.     *Petitioner's Eighth Amendment Claim*

05          Petitioner argues that the Board's decision to deny him a parole release date

06 constitutes cruel and unusual punishment in violation of the Eighth Amendment because he

07 has been imprisoned for a period of time that is "constitutionally disproportionate to the

08 commitment offense or offenses."  (*See* Dkt. 1 at 21.)  Petitioner cites no authority, however,

09 to support his contention that an indeterminate life sentence is a "constitutionally

10 disproportionate" sentence for a first-degree murder conviction.  The United States Supreme

11 Court has held that a life sentence is constitutional, even for a non-violent property crime.

12 *See Rummel v. Estelle*, 445 U.S. 263, 274 (1980) (holding that "the length of the sentence

13 actually imposed is purely a matter of legislative prerogative"); *Harmelin v. Michigan*, 501

14 U.S. 957, 962-64 (1990).  Accordingly, a life sentence for a first-degree murder such as that

15 committed by petitioner would not constitute cruel and unusual punishment.  *See Banks v.*

16 *Kramer*, 2009 WL 256449 (E.D. Cal. 2009) (unpublished) (holding that the Board's refusal to

17 release a prisoner who was sentenced to sixteen years-to-life for murder does not constitute

18 cruel and unusual punishment).  Thus, the Board's decision did not violate petitioner's Eighth

19 Amendment right.

20          D.     *Petitioner's Ex Post Facto Claim*

21          Petitioner also claims that the Board's consideration of the immutable circumstances

22 of his commitment offense to deny parole "transforms an offense for which California

01  provides eligibility for parole into a de facto life imprisonment without the possibility of

02  parole." (Dkt. 1 at 47.)  Specifically, he asserts that "the potential for parole in this case is

03  remote to the point of non-existence…." (*Id*.)  Petitioner claims he "will never receive parole

04  unless some future BPH panel chooses to disregard the facts of the crime." (*Id*. at 46.)  This

05  Court construes petitioner's argument as a claim that the Board's denial violated his right to

06  be free from ex post facto laws, because petitioner contends that the Board has imposed a

07  more severe penalty, a determine life sentence, in place of his indeterminate life sentence.

08  (*See id*. at 46-47.)

09        Petitioner's claim fails for multiple reasons.  First, Article I of the United States

10  Constitution provides that neither Congress nor any state shall pass an ex post facto law.  U.S.

11  Const. Art. I, § 9, cl. 3, Art. I, §10, cl. 1.  Hence, the Ex Post Facto Clause, by definition,

12  applies to the Legislative Branch, not to the courts or an administrative body, such as the

13  Board of Parole Hearings.  *See Rogers v. Tennessee,* 532 U.S. 451, 460 (2001) (holding "[t]he

14  Ex Post Facto Clause, by its own terms, does not apply to courts"); *Marks v. United States,*

15  430 U.S. 188, 191 (1977) ("The Ex Post Facto Clause is a limitation upon the powers of the

16  Legislature, and does not of its own force apply to the Judicial Branch of government.")

17  (citations omitted)); *Lagrand v. Stewart,* 133 F.3d 1253, 1260 (9th Cir.) ("The Ex Post Facto

18  Clause does not apply to court decisions construing statutes."), *cert. denied,* 525 U.S. 971

19  (1998).

20        Moreover, the Board has not increased petitioner's punishment.  The Ex Post Facto

21  Clause prohibits the retrospective application of criminal statutes that change the definition of

22  a crime or enhance the punishment for a criminal offense.  *See Collins v. Youngblood*, 497

01   U.S. 37, 41 (1990) ("Although the Latin phrase 'ex post facto' literally encompasses any law

02   passed 'after the fact,' it has long been recognized ... that the constitutional prohibition on ex

03   post facto laws applies only to penal statutes which disadvantage the offender affected by

04   them.")  Petitioner was sentenced to a term of twenty-seven-years-to-life.  While petitioner

05   might have expected to be released sooner, the Board's decision to deny him a parole release

06   date because he would present an unreasonable risk of danger to society has not enhanced or

07   otherwise "transformed" his punishment.  Accordingly, the Board's decision denying

08   petitioner a parole release date did not violate the Ex Post Facto Clause, and petitioner's claim

09   should be denied.

10        VII.   CONCLUSION

11        As stated above, it is beyond the authority of a federal habeas court to determine

12   whether evidence of suitability outweighs the circumstances of the commitment offense,

13   together with any other reliable evidence of unsuitability for parole.  The Board has broad

14   discretion to determine how suitability and unsuitability factors interrelate to support its

15   conclusion of current dangerousness to the public.  *See Lawrence*, 44 Cal.4th at 1212.

16   Although the Board praised petitioner's recent progress in prison, it determined that petitioner

17   remains an unreasonable risk of danger to society if released on parole.  Because the state

18   court decision upholding the Board's findings satisfies the "some evidence" standard, there is

19   no need to reach respondent's argument that another standard applies.

20        Given the totality of the Board's findings, there is "some evidence" that petitioner

21   currently poses a threat to public safety, and the Fresno County Superior Court's Order

22   upholding the Board's decision was not contrary to, or an unreasonable application of, clearly

01  established federal law, or based on an unreasonable determination of facts.  I therefore

02  recommend that the Court find that petitioner's due process rights were not violated, and that

03  it deny his petition and dismiss this action with prejudice.

04          This Report and Recommendation is submitted to the United States District Judge

05  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days

06  after being served with this Report and Recommendation, any party may file written

07  objections with this Court and serve a copy on all parties.  Such a document should be

08  captioned "Objections to Magistrate Judge's Report and Recommendation."  Failure to file

09  objections within the specified time may waive the right to appeal the District Court's Order.

10  *See Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  A proposed order accompanies this

11  Report and Recommendation.

12          DATED this 7th day of August, 2009.

13

14

15  _____
    JOHN L. WEINBERG
    United States Magistrate Judge

16

17

18

19

20

21

22

REPORT AND RECOMMENDATION -24